IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

DANIEL COLDING,                    )
                                   )
               Plaintiff,          )
                                   )
        v.                         )      Case No.
                                   )      06-0296-REL-SSA
LINDA MCMAHON, Acting              )
Commissioner of Social             )
Security,                          )
                                   )
               Defendant.          )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Daniel Colding seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act"). Plaintiff argues that (1)
the ALJ's credibility finding is not supported by the record, and
(2) the vocational expert's testimony is not supported by the
record. I find that the substantial evidence in the record as a
whole supports the ALJ's finding that plaintiff is not disabled.
Therefore, plaintiff's motion for summary judgment will be denied
and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On January 16, 2004, plaintiff applied for disability
benefits alleging that he had been disabled since August 15,
2003. Plaintiff's disability stems from hypertension, left eye
blindness, and disorders of the knee, ankle, and hip.
Plaintiff's application was denied on April 23, 2004. On June 6,

2005, a hearing was held before an Administrative Law Judge.  On August 15, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On March 24, 2006, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts

2

v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857

3

(8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert George McClellan, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1971 through 2005, shown in both actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1971 | $ 276.80 | $ 1,451.29 |
| 1972 | 273.60 | 1,306.48 |
| 1973 | 634.10 | 2,849.62 |
| 1974 | 531.14 | 2,252.99 |
| 1975 | 181.78 | 717.46 |
| 1976 | 1,251.93 | 4,622.23 |
| 1977 | 5,947.13 | 20,715.78 |
| 1978 | 3,241.91 | 10,461.84 |
| 1979 | 3,377.86 | 10,023.70 |
| 1980 | 5,371.02 | 14,621.34 |
| 1981 | 7,885.02 | 19,501.99 |

5

| | | |
|---|---:|---:|
| 1982 | 7,348.45 | 17,226.53 |
| 1983 | 3,642.42 | 8,142.06 |
| 1984 | 56.25 | 118.76 |
| 1985 | 517.50 | 1,047.92 |
| 1986 | 493.88 | 971.26 |
| 1987 | 0.00 | 0.00 |
| 1988 | 0.00 | 0.00 |
| 1989 | 1,026.00 | 1,738.88 |
| 1990 | 0.00 | 0.00 |
| 1991 | 12,066.04 | 18,844.52 |
| 1992 | 20,324.15 | 30,186.55 |
| 1993 | 21,102.88 | 31,075.90 |
| 1994 | 0.00 | 0.00 |
| 1995 | 15,588.90 | 21,494.47 |
| 1996 | 0.00 | 0.00 |
| 1997 | 0.00 | 0.00 |
| 1998 | 0.00 | 0.00 |
| 1999 | 0.00 | 0.00 |
| 2000 | 0.00 | 0.00 |
| 2001 | 24,478.75 | 25,328.64 |
| 2002 | 25,910.00 | 26,543.38 |
| 2003 | 3,321.19 | 3,321.19 |
| 2004 | 0.00 | 0.00 |
| 2005 | 0.00 | 0.00 |

(Tr. at 83-84).

Case 4:06-cv-00296-REL   Document 10   Filed 02/12/07   Page 6 of 35

**Disability Report - Field Office**

On November 16, 2004, plaintiff met face-to-face with F. Price of Disability Determinations (Tr. at 93-95). The interviewer observed that plaintiff had no difficulty with hearing, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, using his hands, or writing (Tr. at 94).

**Claimant Questionnaire Supplement**

On January 23, 2004, plaintiff completed a Claimant Questionnaire Supplement (Tr. at 96-101). Plaintiff stated that he takes short walks twice a day for less than a half an hour each time. He can sit for an hour, he can stand for half an hour, he can walk short distances with careful steps, he is extremely limited in his ability to lift and carry objects, he can use his hands about 15 minutes, it is painful to bend, it is painful to climb stairs, it is painful to reach forward or backward, it is painful to reach overhead or to sustain any working motions. He stated that he has pain when he attempts to move his body; he experiences pain in his feet, knees, ankles, hips, back, elbows, wrists, neck, shoulders, and head. This pain occurs when any exertion is attempted. His pain is constant. Plaintiff listed dizziness and stomach pain as side effects of his medicine. He was asked if he uses a cane, he wrote, "Not at

7

this time." (Tr. at 98). He reported that he lives alone. He is able to do laundry, wash dishes, make his bed, change sheets, iron, vacuum, sweep, take out the trash, and go to the post office. There have been no changes in his ability to prepare meals. He is able to maintain his personal care routines.

Plaintiff reported that he mostly sleeps during the day. He is able to watch a two-hour movie on television. He can read a newspaper, but he sometimes has difficulty seeing the print. He reported that he had a valid driver's license and he drives once or twice a week to the store or to a friend's house. No doctor had recommended that plaintiff not drive. Finally, he reported that he has no difficulty following written or verbal instructions.

**B.    SUMMARY OF MEDICAL RECORDS**

On November 20, 2003, plaintiff was seen at Truman Medical Center complaining of a black dot in the center of his vision (Tr. at 144). His blood pressure was found to be 204/100; therefore, he was admitted.

On January 6, 2004, plaintiff underwent cyclophoto-coagulation[1] of the left eye in an attempt to reduce the elevated eye pressure due to glaucoma (Tr. at 132).

---

[1]With a laser, the part of the eye that creates the internal fluid is treated in order to reduce the amount of fluid produced thereby decreasing the pressure in the eye.

On February 18, 2004, plaintiff was seen at Truman Medical Center for hypertension (Tr. at 173-174).  Plaintiff's blood pressure was 223/145.  Plaintiff reported alcohol use but said he did not smoke or use drugs.  He was diagnosed with hypertension "remaining unsymptomatic".

On March 11, 2004, plaintiff was seen at Truman Medical Center to establish care with a doctor and get hypertension medications (Tr. at 176-178).  "He denies any complaints and states that he usually goes to the ED [emergency department] to get his medicines.  The patient notes no further positive findings.  A complete review of symptoms was obtained.  All findings are negative".  Plaintiff reported that he uses alcohol daily in the evening, one beer and one shot every day.  His muscle tone was normal in both arms and both legs.  His muscle strength was normal in both arms and both legs.  Plaintiff's weight was 179 pounds and he was measured at 72 inches tall.  He was assessed with hypertension and was prescribed Lisinopril and Metoprolol.

On March 13, 2004, plaintiff was seen at Truman Health Center complaining of ankle pain (Tr. at 179-184).  He said he had been moving furniture the night before.  Plaintiff reported tobacco and alcohol use.  Plaintiff's ankle was x-rayed and the doctor found no fracture or dislocation, but there was mild soft

tissue swelling with a small joint effusion (the build-up of
fluid in a joint).  Early degenerative changes were noted.
Plaintiff was assessed with mild soft tissue swelling, and mild
degenerative joint disease involving the tarsal bones.  Plaintiff
was fitted with an air cast and was given a cane to use.

On March 15, 2004, plaintiff saw Ira Fishman, D.O., at the
request of Disability Determinations (Tr. at 148-151).
Plaintiff's chief complaint was bilateral hip, knee, and ankle
pain which he said he had suffered for several years.  He said
the joint pain limited his tolerance for prolonged sitting and
standing and for walking other than very short distances.  "He
does not, however, utilize an assistive device to ambulate."
Plaintiff's blood pressure was 142/84.  "Mr. Colding states that
he cannot balance safely on a scale for measurement of his height
or weight. . . .  It should be noted that the range of motion
values obtained in both upper and lower extremities are obtained
within the pain limitations of this patient.  Mr. Colding
specifically had complaints of severe pain with any attempts to
assess passive range of motion in both upper and lower
extremities, and especially in the lower extremities with
measurement of hip and knee range of motion, Mr. Colding would
not fully relax his lower extremities to accurately assess
passive range of motion."  Dr. Fishman found slight bony

enlargements of the knees and varus deformities of both ankles. However, examination of those joints did not reveal increased warmth or palpable active joint effusions. "Mr. Colding expresses severe pain with changes in position from the supine to the seated position on the examination table, as well as from the seated to the standing position. He ambulates with exaggerated antalgic gait, favoring both knees and ankles. He does not, however, display evidence of ataxia[2]." Dr. Fishman's diagnostic impression was written as follows: "Mr. Colding has complaints of considerable joint pain, particularly involving his lower extremities. The examination completed today at best revealed evidence of mild degenerative joint disease involving his knees and ankles. The examination completed today did not yield any significant pupil reactivity in the left eye. Mr. Colding reports that he has been declared legally blind in the left eye."

Dr. Fishman was unable to obtain enough objective physical findings to determine specific functional limitations due to the exam being "significantly pain-limited". Plaintiff's range of motion measurements were as follows: shoulder abduction (lifting arm above head from the side) was 140° bilaterally (normal is

---

[2]Ataxia is unsteady and clumsy motion of the limbs or torso due to a failure of the gross coordination of muscle movements. Ataxia often occurs when parts of the nervous system that control movement are damaged. People with ataxia experience a failure of muscle control in their arms and legs, resulting in a lack of balance and coordination or a disturbance of gait.

180°); elbow flexion (arm straight out in front, lifting at the
elbow until forearm is perpendicular to the floor) was normal
bilaterally, knee flexion was 120° bilaterally (normal is 150°),
hip flexion was 80° bilaterally (normal is 100°), wrist flexion
and extension were normal bilaterally, lumbar anterior flexion
(bending forward at the waist) was 40° (normal is 90°), lumbar
lateral flexion (bending to the side at the waist) was 15°
(normal is 25°).  Plaintiff was able to pick up coins, turn door
knobs, and button buttons with both hands (Tr. at 151).

On March 30, 2004, plaintiff had x-rays of his right hip and
right knee (Tr. at 154).  All x-rays were normal.

On April 22, 2004, a physician from Disability
Determinations completed a Physical Residual Functional Capacity
Assessment (the doctor's signature is illegible) (Tr. at 155-
162).  This doctor found that plaintiff could occasionally lift
20 pounds, frequently lift ten pounds, stand or walk for two
hours per day, sit for six hours per day, and had an unlimited
ability to push or pull.  He had no postural limitations, such as
climbing, balancing, stooping, kneeling, crouching, or crawling.
He had no manipulative limitations such as reaching, handling, or
fingering.  He was limited visually due to left eye blindness.
He had no communicative or environmental limitations.

12

On May 18, 2004, plaintiff was admitted to Truman Medical Center (Tr. at 185-188, 198-199). Plaintiff fell at home the night before and landed on his outstretched right hand. He said about six times in the last six months his feet and legs had not worked and he had fallen. He was found to have significantly uncontrolled hypertension (216/133) and was admitted for that reason. Plaintiff reported that he smokes a pack of cigarettes every three days and had for five years, although he had quit smoking 20 years ago. He said he has six drinks per week. He said he was walking along his back yard and his hips gave out. He said his blood pressure medicine was not working and he had ringing in his ears and some spots before his eyes. He said he was at a cocaine party on Saturday night but denied using any cocaine. His tests came back positive for cocaine, however. "He does have a history of aggressive alcohol use, and before falling, he had taken many mixed drinks and beers." An EKG was normal. X-rays were taken of his right hand and revealed a fracture of the index finger. A splint was put on his finger. The doctor determined that plaintiff did not faint, and that his falling was "most likely due to the patient's intoxication/deconditioning." Plaintiff was discharged with Norvasc, Lisinopril, Hydrochlorothiazide, Ibuprofen 800 mg twice a day as needed for pain, and Percocet, one to two tablets every four to

13

six hours as needed for pain. He was told to adhere to a diet
with no more than one to two grams of sodium.

On May 27, 2004, plaintiff was seen at Truman Medical Center
(Tr. at 190-193). He complained that his blood pressure had been
running high and he had been feeling dizzy. His blood pressure
was 125/87, and his pulse was 110. He was assessed with
dizziness and was discharged with instructions to avoid alcohol
and illicit drug use.

On June 1, 2004, plaintiff was seen at Truman Medical Center
for a check up[3] (Tr. at 194-196). His blood pressure was 123/72,
his pulse was 83, his height was 72 inches, and his weight was
178 pounds. Plaintiff had blood work and his blood glucose was
high at 112 (normal is 100 or less). Plaintiff reported that he
was drinking one beer and one shot every day. His muscle tone
was normal in both arms and both legs, his muscle strength was
normal in both arms and both legs. Plaintiff was diagnosed with
hypertension, stable on Norvasc, Lisinopril, and HCTZ, and he was
told to continue on his same medications. He was also diagnosed
with dizziness with presyncope (pre-fainting). "Appears that
patient may be having arrythmias[4]. Will check a TSH and refer to

---

[3]Page 2 of this four-page record is missing.

[4]Cardiac arrhythmia is a group of conditions in which the
muscle contraction of the heart is irregular or is faster or
slower than normal.

14

cardiology for possible holter monitoring."

On June 11, 2004, plaintiff was seen at Truman Medical Center for a follow up on his finger (Tr. at 197). His splint was removed and x-rays were taken. Plaintiff was released to activity as tolerated.

On September 1, 2004, plaintiff was seen at Truman Medical Center complaining of headache, sinus drainage, and depression (Tr. at 200-201). Plaintiff's blood pressure was 172/108, his height was 72 inches and his weight was 178 pounds. Plaintiff reported that he had been taking 800 mg Ibuprofen four times a day for his headaches, but he was told that amount is toxic so he stopped taking the ibuprofen. He said the pain was worse because of his depression, the lights and sounds. It was better when he would lie down. Plaintiff reported he had suffered from depression for many years, but he had not seen a psychiatrist and was not on any medication for depression. He also reported weakness in his arms and legs for about a year. He said he was given a Holter monitor and then was told to see cardiology. He was unable to keep that appointment because of weakness, but now asked for another cardiology referral. Plaintiff was given amitriptyline for his headache, and a prescription for 800 mg ibuprofen three times a day as needed. Regarding his depression, the doctor wrote, "I do not believe he is a danger to himself or

others, but should have some follow up for the depression.  So we will refer him to behavioral health."  Plaintiff's hypertension medications were refilled.

On January 21, 2005, plaintiff was seen at Truman Medical Center for foot pain caused by an ingrown toenail (Tr. at 202-207).  His blood pressure was 177/122.

On March 31, 2005, at approximately 4:15 a.m. plaintiff was running up a hill to catch a bus when he developed chest pain.  As he continued to walk, the pain became progressively worse.  He caught the bus, but the bus driver took him to the emergency department where he was given nitroglycerin.  Plaintiff reported that he was a smoker but quit 15 years ago.  He said he was homeless and drinks a beer and double shot daily if he has the money.  The cardiologist noted that plaintiff has a history of cocaine use but plaintiff claimed to the cardiologist that he quit about a year ago, after having told the ER doctor that he quit six months ago.  Plaintiff was diagnosed with typical angina (chest pain), hypertension, acute renal failure, anemia, and history of cocaine use.  He was found to be euthymic (normal) with a full affect.  "[B]ased on his symptoms as well as history of hypertension and cocaine use, this patient falls into a high-risk category for significant coronary artery disease.  We would like to refer this patient for a cardiac catheterization, but

16

this can be done as an outpatient.  In addition, we would like to further investigate his renal function before giving him a dye load.  The plan is to discontinue his lisinopril and start him on metropolol.  In addition, he should take nitroglycerin as needed as an outpatient." (Tr. at 208-215).

On April 5, 2005, plaintiff was seen by Annette Quick, M.D., a cardiologist (Tr. at 222-224).  Dr. Quick performed an echocardiogram which was normal.  Her conclusions were:

1)     Normal left ventricular size and systolic function, and an ejection fraction of 65%.[5]

2)     Normal diastolic function.

3)     No significant flow abnormalities.

4)     Normal pulmonary artery pressure.

**C.     *SUMMARY OF TESTIMONY***

During the June 9, 2005, hearing, plaintiff testified; and George McClellan, a vocational expert, testified at the request of the ALJ.

_____

[5]The ejection fraction is a measurement of the heart's efficiency and can be used to estimate the function of the left ventricle, which pumps blood to the rest of the body. The left ventricle pumps only a fraction of the blood it contains. The ejection fraction is the amount of blood pumped divided by the amount of blood the ventricle contains. A normal ejection fraction is more than 55% of the blood volume.

### 1. Plaintiff's testimony.

Plaintiff is 49 years of age (Tr. at 27). Plaintiff dropped out of school in his senior year and did not get a GED (Tr. at 27). Plaintiff last worked as a truck driver in 2003 (Tr. at 27-28). Every year the employees had to take a physical, and he could not pass the physical so he was let go (Tr. at 28). Also, his company lost the account he was driving for (Tr. at 28). He drew his unemployment for as long as he could (Tr. at 28-29). While he was collecting unemployment, he was looking for other work but he was never called back (Tr. at 29). He tried to get any work he could, and the last job he applied for was sanitation, emptying trash cans (Tr. at 29-30).

Plaintiff's medical condition has gotten worse since he last worked (Tr. at 30). When he was let go from his job, he had high blood pressure and he was having migraines and stomach problems from the medicine (Tr. at 30). Plaintiff has no vision at all in his left eye (Tr. at 31). Plaintiff's vision in his right eye is weak, but with glasses he may be able to read a book (Tr. at 32). Plaintiff wore sunglasses during the hearing and testified that if the light gets in his eye, he will get a migraine (Tr. at 32). He had prescription glasses, but he lost them about six months ago and his Medicaid was canceled, so he has to wait to get some new ones (Tr. at 32, 33).

18

If plaintiff goes up stairs too briskly, he will have chest pain and he has to take nitroglycerin (Tr. at 34). Plaintiff takes the nitroglycerin a couple of times a day (Tr. at 35). Plaintiff was in the hospital for kidney failure and he continues to take medicine for that (Tr. at 35). He goes to the bathroom kind of frequently, and there's some pain but he has gotten used to that (Tr. at 36). Plaintiff was on 800 mg of ibuprofen for his migraines, but they got so bad he would take three of those (Tr. at 36). The doctors got concerned about that affecting his kidney function (Tr. at 36). Plaintiff gets migraines a couple of times a day (Tr. at 36). He gets a hot towel and lies down for about 45 minutes (Tr. at 36-37). But sometimes his migraines last three hours (Tr. at 37).

Plaintiff has not driven for the past year and a half (Tr. at 37-38). He does not own a car (Tr. at 38). Plaintiff took the bus to his administrative hearing (Tr. at 38). Plaintiff asks the driver to tell him when it is time to get off the bus (Tr. at 38). As long as he keeps his sunglasses on, his vision problem is bearable (Tr. at 38).

Plaintiff has been using a cane for a couple of years (Tr. at 38). His doctor prescribed it for balance (Tr. at 38). If plaintiff does not have his cane with him, he crawls to the bathroom (Tr. at 39). When plaintiff stands up, he gets dizzy

(Tr. at 39). If he sits too long, he also gets dizzy (Tr. at 40). Plaintiff does not bend ever, because he has no way of getting back up (Tr. at 40). He just gets down on his knees (Tr. at 40). He cannot stoop either (Tr. at 40). He was asked how he would pick something up if he dropped it on the floor, and he said, "Stoop -- get down on my knees." (Tr. at 40).

Plaintiff was asked about the medical records which indicated plaintiff tested positive for cocaine (Tr. at 40). He said that he has not used cocaine in about nine months (Tr. at 41). He said he never used cocaine when he was working, he just used it at a party to impress someone (Tr. at 41). He said he had been drug-free his entire life, and he just "goofed up" that one time (Tr. at 41). Plaintiff testified that he would like to have a beer, but he cannot afford any alcohol (Tr. at 42). He said the last time he had had alcohol was the night before the hearing, and a friend bought it for him (Tr. at 42). Before he started taking all of his medicines, he would drink a shot and three beers (Tr. at 42). Now his stomach cannot take it (Tr. at 42). He hasn't had regular alcohol in about a year and a half (Tr. at 42).

Plaintiff suffers from anxiety and depression (Tr. at 43). He testified those impairments would affect his ability to work because he has "serious problems to light, and to sound, being

20

around people." (Tr. at 43). He sleeps only a couple of hours a night, and he sleeps when he can during the day (Tr. at 43).

Plaintiff testified that he was homeless (Tr. at 43). He uses his sister's address as his mailing address, and he goes to his brother's house to take a shower so his brother can help him if he falls down (Tr. at 44). Because plaintiff lost his Medicaid, he just has old prescriptions and he takes one instead of two to try to make them last (Tr. at 44).

Plaintiff was asked whether he could do any job full time (Tr. at 45). He said that he would take anything, but he thinks he is too unsteady (Tr. at 45).

Plaintiff was asked about when he fell and hurt his hand (Tr. at 46). He testified that was when he had tried cocaine for the first time, and he fell and used his hand to break his fall (Tr. at 46). He had also had a couple of beers on that occasion (Tr. at 46).

**2. Vocational expert testimony.**

Vocational expert George McClellan testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could occasionally climb stairs, stoop, bend, twist, kneel, or crawl; could not balance, work at heights, climb ladders, work around hazards or dangerous machinery; could not drive; could not work

21

where binocular vision is required; and was limited to sedentary work (Tr. at 48). The vocational expert testified that such a person could not perform plaintiff's past relevant work, but the person could be an information clerk, a surveillance system monitor, or a telephone solicitor (Tr. at 48). There are 2,300 information clerk jobs in Missouri and 100,000 in the country; there are 2,000 to 3,000 surveillance system monitors in Missouri, and 100,000 in the country; and there are 3,800 telephone solicitors in Missouri and 180,000 in the country (Tr. at 49).

The second hypothetical involved a person with the same limitations as the person in the first hypothetical but also assumes the person would miss work about four times per month (Tr. at 49). The vocational expert testified that such a person could not be gainfully employed (Tr. at 49).

The third hypothetical included the first but added the limitation that the person has light sensitivity and cannot focus or use his vision at all for more than one hour and then would need a rest break of 15 to 20 minutes (Tr. at 49-50). The vocational expert testified that the person could not hold any job (Tr. at 50).

The fourth hypothetical included the first but added the fact that the person would have a migraine headache every day or

22

every other day for 45 minutes to three hours, during which the person would have to rest in a darkened room (Tr. at 50). The vocational expert testified that the person could not work (Tr. at 50).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Michael Breton entered his opinion on August 15, 2005 (Tr. at 15-22). The ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date (Tr. at 16). He found that plaintiff suffers from left eye blindness, hypertension, and joint pain, impairments that are severe (Tr. at 17). Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 17).

The ALJ determined that plaintiff's testimony was not entirely credible (Tr. at 18-19). He determined that plaintiff retains the residual functional capacity to lift ten pounds occasionally and less than ten pounds frequently; sit for six hours; stand or walk for two hours; occasionally climb stairs, stoop, bend, twist, kneel, or crawl; cannot balance or walk on rough terrain; must avoid exposure to heights, ladders, driving, and hazardous dangerous machinery; and is limited to performing activities not requiring binocular vision (Tr. at 18). With this residual functional capacity, plaintiff cannot return to his past relevant work as a truck driver (Tr. at 19). The ALJ found that

23

plaintiff could, however, perform the jobs of information clerk, surveillance system monitor, or telephone solicitor, all of which are available in significant numbers in the national and regional economies (Tr. at 20). Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. Specifically, plaintiff argues that the ALJ failed to consider the substantial medical evidence supporting plaintiff's complaints of severe limitations caused by hypertension, blindness in his left eye, degenerative joint disease, migraine headaches, fatigue, and depressive symptoms.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.

24

<u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v.</u>
<u>Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ
explicitly discredits testimony and gives legally sufficient
reasons for doing so, the court will defer to the ALJ's judgment
unless it is not supported by substantial evidence on the record
as a whole.  <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit
plaintiff's subjective complaints is supported by substantial
evidence.  Subjective complaints may not be evaluated solely on
the basis of objective medical evidence or personal observations
by the ALJ.  In determining credibility, consideration must be
given to all relevant factors, including plaintiff's prior work
record and observations by third parties and treating and
examining physicians relating to such matters as plaintiff's
daily activities; the duration, frequency, and intensity of the
symptoms; precipitating and aggravating factors; dosage,
effectiveness, and side effects of medication; and functional
restrictions.  <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir.
1984).  Social Security Ruling 96-7p encompasses the same factors
as those enumerated in the <u>Polaski</u> opinion.

The specific reasons listed by the ALJ for discrediting
plaintiff's subjective complaints of disability are as follows:

> I did not find the claimant's allegations credible to the
> extent alleged.  According to his testimony and the

Case 4:06-cv-00296-REL   Document 10   Filed 02/12/07   Page 25 of 35

activities of daily living questionnaires, Mr. Colding performs activities of daily living and they are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Although he complained of migraines, this was not corroborated by the subjective complaints documented in the claim file. He minimized his cocaine use stating it was only one time, but when he tested positive at the hospital, the claimant said that he was essentially clean his whole life. He admitted that he still uses alcohol. Mr. Colding testified that he collected unemployment compensation after he lost his last job and that he looked for similar work such as a sanitation position.

(Tr. at 18-19).

## 1.   PRIOR WORK RECORD

Although plaintiff reported that he has worked as a truck driver "all his life", the record establishes that prior to plaintiff's alleged onset date, he earned no income at all during nine years. In addition, he earned only $118.76 (indexed) one year, $717.46 (indexed) another year, $971.26 (indexed) during one year, $1,047.92 (indexed) during another year, and $1,738.88 (indexed) during another year. His alleged onset date is August 15, 2003, yet during those seven and a half months of 2003, plaintiff earned only $3,321.19, an average of only $103 per week, although he reported earning $10 per hour as a truck driver (which would be $400 per week).

Plaintiff's gaps in earnings prior to his alleged onset date indicates that he may now be unemployed due to reasons other than his impairments.

Case 4:06-cv-00296-REL   Document 10   Filed 02/12/07   Page 26 of 35

*2. DAILY ACTIVITIES*

In his claimant questionnaire supplement, plaintiff reported that he was living alone, that he was able to do laundry, wash dishes, make his bed, change sheets, iron, vacuum, sweep, take out the trash, go to the post office, and maintain his personal care routines. He had a valid driver's license and was able to drive in January 2004.

In March 2004, plaintiff hurt his ankle moving furniture. A year later, he was running up a hill trying to catch a bus when he felt chest pain. These medical records are entirely inconsistent with his testimony that he has to crawl to the bathroom if he does not have his cane, and that he is "extremely limited" in his ability to lift and carry objects.

*3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

Plaintiff reported in his administrative documents that no doctor ever recommended that he not drive. In March 2004, plaintiff was seen at Truman to establish care and get some refills, and he denied any complaints. A complete review of all symptoms was obtained and all findings were negative. Later that month, plaintiff injured his ankle moving furniture, and he was given a cane to use. Two days later, he saw Dr. Fishman and he was not using any assistance device to ambulate. In March 2005, he was running up a hill to catch a bus. However, in June 2005,

27

he testified that he had been using the cane "for a couple of years". The medical evidence does not support this claim.

In June 2004, plaintiff had the splint removed from his finger. He then went almost three months without relevant medical care. After his September 2004 visit for depression, among other things, he was told to follow up with behavioral health, but there are no records suggesting he did that. Instead, he went another five months without medical care and then went to the doctor due to an ingrown toenail.

The medical evidence does not support plaintiff's allegations regarding the duration, frequency, and intensity of his joint pain, dizziness symptoms, migraines, or depression.

*4.* *PRECIPITATING AND AGGRAVATING FACTORS*

The record establishes that plaintiff fell and broke his finger after he used cocaine and many mixed drinks and beers. The doctor determined that plaintiff did not faint, that he fells due to his intoxication, and that his EKG was normal. The records show that plaintiff continued to drink and in fact testified that he had alcohol the night before his administrative hearing.

The record establishes that plaintiff had a minor ankle injury after having moved furniture. There are no other

28

precipitating or aggravating factors established through the medical records.

**5.  *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

Plaintiff reported in his Claimant Questionnaire Supplement that his medicine causes dizziness and stomach pain; however, he never complained of these symptoms as side effects to any doctor.

Plaintiff told a doctor at Truman that he stopped taking his prescribed ibuprofen because someone told him the amount he was taking was toxic (800 mg four times per day).  Yet that doctor prescribed 800 mg of ibuprofen three times a day, and there are no medical records suggesting that any doctor ever expressed concern over the toxicity of the ibuprofen plaintiff was taking.

Plaintiff's hypertension medication was rarely changed, and it was described as stable on medication.

**6.  *FUNCTIONAL RESTRICTIONS***

Plaintiff reported in his administrative documents that he can sit for an hour, stand for half an hour, walk short distances with careful steps, is extremely limited in his ability to lift, and can only use his hands for about 15 minutes.

A Disability Determinations interviewer met face to face with plaintiff and observed that plaintiff had no difficulty understanding, concentrating, sitting, standing, walking, using his hands, or writing.  A Disability Determinations physician

29

found that plaintiff could lift ten to 20 pounds, stand or walk for two hours, sit for six hours, and had an unlimited ability to push or pull. Plaintiff had no postural limitations and no manipulative limitations. No treating physician ever recommended that plaintiff limit his standing, sitting, walking, lifting, or using his hands. Finally, while plaintiff was collecting unemployment, he applied for jobs including a job with sanitation which involved emptying trash cans.

**B.    *CREDIBILITY CONCLUSION***

Plaintiff argues that the ALJ disregarded plaintiff's severe limitations caused by hypertension, blindness in his left eye, degenerative joint disease, migraine headaches, fatigue, and depressive symptoms.

<u>Hypertension</u>. Although plaintiff's blood pressure was often found to be high, there is no evidence that he suffered any limitations from hypertension much less severe limitations. In February 2004, plaintiff's blood pressure was 223/145, but he was diagnosed with hypertension "remaining unsymptomatic". In June 2004, plaintiff was diagnosed with hypertension, stable on Norvasc, Lisinopril, and HCTZ. Despite having hypertension, plaintiff continued to smoke cigarettes and drink alcohol.

<u>Blindness in left eye</u>. The records do support plaintiff's claim of left eye blindness. However, the records do not support

30

a finding that plaintiff's vision is more limited than that found by the ALJ. After plaintiff lost the vision in his left eye, he was no longer treated for that condition. No doctor ever recommended that plaintiff not drive, and he had a valid driver's license despite his left eye blindness.

Degenerative joint disease. In March 2004, plaintiff's muscle tone was normal in both arms and both legs, and his muscle strength was normal in both arms and both legs. That same month, he was moving furniture and hurt his ankle. He had only early degenerative changes noted on x-rays, and he was assessed with mild degenerative joint disease.

When plaintiff saw Dr. Fishman, he was noted to have only mild degenerative joint disease involving his knees and ankles. Despite plaintiff's exam being significantly limited, plaintiff's range of motion measurements were either normal or near normal. His elbow flexion was normal, wrist flexion and extension was normal, his shoulder abduction was nearly normal, his knee flexion was nearly normal, his hip flexion was nearly normal. He was able to pick up coins, turn door knobs, and button buttons with both hands. Plaintiff's hip and knee x-rays were normal.

In June 2004, plaintiff's muscle tone was normal in both arms and both legs, and his muscle strength was normal in both arms and both lets.

31

Migraine headaches.  Plaintiff testified that he has migraines every day, sometimes multiple times per day.  He also wore sunglasses during the hearing and testified that if light gets in his eye, he will get a migraine.  The medical evidence does not support this allegation.

No medical record mentions that plaintiff wore sunglasses during any medical visit, nor did he report the need to do so. In March 2004, plaintiff was seen at Truman to establish care and get hypertension medications.  He denied any complaints and a complete review of symptoms was negative.  Plaintiff never complained of a migraine to any doctor, he was never diagnosed with migraines, and he was never given medication for migraines. The only time plaintiff complained of a headache to a treating physician was in September 2004 when he also complained of sinus problems.

Fatigue and depressive symptoms.  The first and only time plaintiff complained of depression to any doctor was on September 1, 2004.  The doctor recommended he follow up on depression and referred him to behavioral health; however, there is no evidence that plaintiff followed through with that.  Plaintiff was never given any medication for depression, he never participated in counseling, and he never again complained of depression to his treating physicians.

32

In March 2005 when plaintiff went to the hospital after experiencing chest pain while running to catch a bus, he was found to be euthymic (which is normal), with a full affect.

There simply is no evidence in the record to support plaintiff's claim of severe limitations due to depression.

In addition to the Polaski factors discussed above, and the discussions regarding plaintiff's specific alleged severe limitations, I find that other evidence in the record supports the ALJ's finding that plaintiff is not entirely credible. Plaintiff testified he had used a cane for several years; however, he did not have it with him two days after he was given the cane, no other doctor mentioned plaintiff having a cane, plaintiff moved furniture and he ran up a hill to catch a bus. Plaintiff's testimony that without a cane he has to crawl is belied by the evidence.

Plaintiff told Dr. Fishman on March 15, 2004, that he could not balance well enough to have his weight and height measured; however, subsequent to that statement, plaintiff was weighed and his height measured on June 1, 2004, and on September 1, 2004.

Plaintiff had an EKG which was normal. He had an echo-cardiogram which was normal. His x-rays were all essentially normal.

Case 4:06-cv-00296-REL   Document 10   Filed 02/12/07   Page 33 of 35

Plaintiff tested positive for cocaine on May 18, 2004. He told an ER doctor on March 31, 2005, that he quit using cocaine about six months earlier, and in June 2005, he testified that he had not used cocaine for nine months. These dates do not suggest that plaintiff used cocaine only one time, on May 18, 2004, as he testified.

Plaintiff testified that he could never stoop, but then when he was asked how he would pick up something he had dropped, he said, "Stoop -- get down on my knees."

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations are not credible. Therefore, his motion for summary judgment on this basis will be denied.

## VII. VOCATIONAL EXPERT TESTIMONY

Plaintiff next argues that the hypothetical on which the ALJ relied did not detail all of plaintiff's impairments. Plaintiff argues that the hypothetical does not address limitations caused by plaintiff's migraine headaches, light sensitivity, cardiac impairment, depression, and fatigue.

A hypothetical is proper if it includes all of the impairments and restrictions found credible by the ALJ. Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995); Davis v. Shalala, 31 F.3d 753, 755-56 (8th Cir. 1994). All of the

34

specific alleged limitations plaintiff claims were improperly left out of the hypothetical have been addressed above. Based on the previous discussion, I find that the ALJ's hypothetical to the vocational expert did indeed encompass all of plaintiff's credible limitations. Therefore, his motion for summary judgment on this basis will be denied.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 12, 2007

35